### CARL L. JENSEN CO. v. CLAY.

(Circuit Court, D. New Jersey. December 22, 1893.)

PATENTS—INFRINGEMENT—PEPSIN.

> The second claim of the Jensen patent, No. 286,138, which claims, as a new article of manufacture, pepsin made according to the process described and claimed in the patent, is not infringed by pepsin produced by dialysis according to the Russell patent, No. 424,357.

In Equity. Suit by the Carl L. Jensen Company against John Clay for infringement of a patent. Bill dismissed.

Joshua Pusey, for complainant.

William P. Chambers and George H. Lothrop, for defendant.

ACHESON, Circuit Judge. The bill charges the defendant with infringement of letters patent No. 286,138, dated October 2, 1883, granted to Carl L. Jensen for improvements in the manufacture of pepsin. The patent has two claims; the first for the described process of manufacture, the second for the product. The process consists in finely cutting up the mucous membranes or the whole stomachs of animals, placing the same in a vessel containing acidulated water, and subjecting the mixture to heat, whereby an artificial digestion takes place akin to the action in the natural stomach, resulting in a sirupy liquid or peptone, which, "after clarifying and purifying by any of the well-known methods," is spread on glass plates to dry, and is then scraped off, and the flakes or scales passed through a fine sieve. The defendant did not manufacture the pepsin complained of, but merely sold it; the manufacturer being Parke, Davis & Co., a corporation of the state of Michigan. For convenience, however, it will hereinafter be designated as defendant's pepsin.

The charge of infringement of the first claim of the patent is not insisted on. The second claim (the one here involved) is in the words following:

"(2) As a new article of manufacture, the within-described pepsin in the form of hard scales or crystals, transparent, odorless, tasteless, capable of being permanently preserved, freely soluble in water without the use of acid, free from inert additions, and having a digestive power of one to seven hundred, substantially as set forth."

The defenses are: (1) That the patented article was put in public use and on sale in this country by the patentee more than two years before his application for a patent; (2) that it was known, made, and used by others in this country prior to his invention; (3) noninfringement. In the view I take of the case, it will only be necessary for me to consider the defense last mentioned. Upon principle and authority it is clear that the second claim of the patent in suit covers only pepsin manufactured by the process described in the patent, or by substantially the same process. Dittmar v. Rix, 1 Fed. 342; Pickhardt v. Packard, 22 Fed. 530; Smith v. Vulcanite Co., 93 U. S. 486, 493; Cochrane v. Soda Fabrik, 111 U. S. 293, 310, 313, 4 Sup. Ct. 455; Bene v. Jeantet, 129 U. S. 683, 686, 9 Sup. Ct. 428. The real question, then, is, was the article sold by the defendant made in the mode described by Jensen, or by an equivalent process? The burden of proof to show infringement is, of course, upon the plaintiff. No direct evidence has been given by the plaintiff to show how the defendant's pepsin was manufactured. The plaintiff's case rests exclusively upon the alleged correspondence in physical qualities between the Jensen pepsin and the defendant's. At the most, however, such evidence only makes out a prima facie case of infringement. But here the defendant has produced positive and uncontradicted testimony that his pepsin was made in accordance with letters patent No. 424,357, dated March 25, 1890, granted to John B. Russell. In this state of the proofs, the positive evidence should prevail. Bene v. Jeantet, supra. From the mere grant of the Russell patent there arises a presumption that the process therein described is distinct from that of Jensen. That the two processes are different in principle appears upon a comparison of the patents and a consideration of the proofs. Jensen's process aims to retain all the peptone formed in the digestion of the stomach tissue, and also preserves the other soluble products of digestion. On the other hand, the Russell process reduces the peptone and soluble mineral matter, and to that end the peptic solution is subjected to dialysis.

It is very clear from the evidence that the words "clarifying and purifying by any of the well-known methods," as found in Jensen's patent, were not intended to cover the use of a dialyzer. Upon this point, Prof. Stebbins, the plaintiff's expert, testifies:

"It is, however, my opinion that the process of clarifying and purifying referred to in Jensen's patent meant only the removal of the coarser particles of material, consisting of fat, adipose tissue, and certain mineral matter, by filtration or other means."

This witness also states that the process of dialysis would unquestionably remove a portion of the peptone, and also change the percentages of mineral salts present in the pepsin solution. In this connection, the following extract from the testimony of Prof.

Stebbins, who was the only witness called by the plaintiff to prove infringement, deserves serious consideration:

"67 R. C. Q. In your answers to 47 and 48 R. D. Q.'s, do you intend to draw a distinction between pepsin made by a process which aims at separating a portion of the peptone and the pepsin of the Jensen patent? A. Well, I think a distinction should be made, inasmuch as the two kinds of pepsin would differ considerably in their physical, as well as chemical, characteristics. 68 R. C. Q. Then you would consider a pepsin made by a process which partially separated the peptone as a different pepsin from that described and claimed in the Jensen patent? A. I would."

Now, under the proofs, it is not to be doubted that by the process followed in the manufacture of the defendant's pepsin the peptone is partially eliminated. According to analyses made by Prof. Chittenden, the defendant's expert, the percentage of ash and water together in the Jensen pepsin amounts to 19.22 against only 8.09 in the defendant's pepsin, showing a difference in favor of the latter of over 10 per cent. in these two inactive substances; and, comparing peptone with peptone, the defendant's pepsin contains 5.9 per cent. less peptone than Jensen's, so that the defendant's pepsin has 16.22 per cent. less inactive matter than the Jensen pepsin. But this is not all. Calculated on an ash-free and a water-free basis, which is the true method of comparison, the difference in peptone is 14.26 per cent., this being the reduction of peptone in the defendant's pepsin as the effect of dialysis. In digestive power, which is the test of therapeutic value, the difference in favor of the defendant's pepsin is remarkable, Jensen's pepsin being only a little more than one-third as strong as the defendant's. In view of these facts, Prof. Chittenden's opinion is that the two forms of pepsin are decidedly different. The attention of Prof. Stebbins, upon his cross-examination, was called to the relative strength of the two preparations, and his answers (which follow) are very significant:

"33 C. Q. How, then, do you account for the fact that you found the defendant's pepsin much stronger than the Jensen pepsin? A. I can't account for it, unless it is owing to some special mode of preparation." "29. C. Q., (in rebuttal.) The ferment pepsin in both Jensen's and defendant's preparations of pepsin being the same, is it not certain that there must be some great difference between these preparations to account for their great difference in digestive power? A. Unquestionably there is some great difference, other than the differences already mentioned, namely, the quantities of ash, moisture, and peptone; but what this difference is, I am unable to say."

The inability of this witness to explain to his own satisfaction the striking difference in strength between the two preparations, which undeniably exists, is the less surprising when it is remembered, as he himself states elsewhere in his testimony, that pepsin is a very obscure thing, not fully understood by scientific men, and has never been isolated in an absolute state of chemical purity.

Another quotation from Prof. Stebbins' testimony is here pertinent:

"48 C. Q., (in rebuttal.) Does not the therapeutic value of a preparation of pepsin depend upon its digestive power? A. It does. 49 C. Q. And does not the enormous difference in digestive power between the Jensen pepsin and the defendant's pepsin mark a great advance in this art? A. It certainly marks an advance; yes."

Now, in dealing with the question of infringement here involved, it is to be borne in mind that in the preparation of pepsin as an article of pharmacy Jensen was by no means a pioneer. Its extraction from the stomachs of animals by mincing the mucous membranes and producing artificial digestion thereof under the action of diluted acid and heat, was old and well known, as appears from Foster's Physiology, published in 1877, and as, indeed, may be inferred from the recital in Jensen's own patent. Neither was Jensen the first to prepare the article in the form of scales produced by evaporation to dryness of the peptic solution.

The evidence fully justifies the conclusion that Jensen's patented process will not make the defendant's pepsin. This is shown by Prof. Chittenden's experiments, to which he testifies. I discover nothing in the proofs to discredit his tests. Then, again, the Jensen patent itself fixes the digestive power of the product at 1 to 700 only. Here, too, the testimony of the plaintiff's witness William H. Ball is important. He has been in the plaintiff's service since the middle of the year 1890, and fully understands the process it employs. He says that when he first became connected with the plaintiff company the digestive power of the pepsin then made by it was 1 to 600, but that at the time he testified (February, 1892,) the digestive power of the pepsin the plaintiff was then producing was 1 to 1,800. He was asked to describe the process by which the plaintiff then manufactured its pepsin, but declined to do so. The inference is irresistible that Jensen's patented process will not produce a pepsin having the digestive power of that sold by the defendant, and that the plaintiff is employing other and secret means to secure such result. Taking the proofs as a whole, it is clear to me that they fail to make out the charge of infringement; and therefore, without passing upon the other defenses, the bill of complaint will be dismissed.

Let a decree be drawn dismissing the bill, with costs.